**Howard RUFF and Kay Ruff, husband and wife; Charles Bates and Ellen Bates, husband and wife; and Rodney Petersen and Marilyn Petersen, husband and wife, Plaintiffs,**

v.

**ENSIGN–BICKFORD INDUSTRIES, INC., a Connecticut corporation; the Ensign–Bickford Company, a Connecticut corporation; Mallinckrodt Inc., a New York corporation Defendants.**

No. 2:99–CV–120B.

United States District Court,
D. Utah,
Central Division.

Oct. 25, 2001.

---

**13.** The Court makes no determination at this time regarding any forthcoming applications for costs and attorneys' fees.

David K. Isom, J. Preston Stieff, David K. Isom Law Offices, Salt Lake City, UT, Lynn Lincoln Sarko, Margaret E. Wetherald, Keller Rohrback, Seattle, WA, Shane R. Swindle, Laurie B. Fields, Gary A. Gotto, Mark D. Samson, Dalton Gotto Samson & Kilgard PLC, Phoenix, AR, for Plaintiffs.

Mark W. Dykes, LeBoeuf Lamb Greene & Macrae LLP, Salt Lake City, UT, Eden C. Steele, Gary E. Parish, Arthur P. Mizzi, LeBoeuf Lamb Greene & Macrae LLP, Denver, CO, Daniel M. Allred, Francis M. Wikstrom, John B. Wilson, Parsons Behle & Latimer, Salt Lake City, for Defendants.

## MEMORANDUM OPINION & ORDER

BENSON, District Judge.

### INTRODUCTION

This matter is before the Court on defendants' combined motion for summary judgment and motion to exclude the testimony of plaintiffs' dose estimate expert, Shepherd Miller Inc. ("SMI").[1] Defendants Ensign–Bickford Industries, Inc., the Ensign–Bickford Company, and Mal-

---

1. Drs. Terry McLendon, Michael Meyer and Eric Woodland are employed at SMI. Defendants initially included Michael Meyer and Eric Woodland in this motion in limine. At the August 23, 2001, *Daubert* hearing, defendants informed the Court that Dr. Meyer was not the subject of the instant motion in li-

mine. In addition, it appears that defendants have conceded that Eric Woodland is not one of plaintiffs' designated experts, but rather was a staff scientist at SMI when SMI issued its original expert degradation and dose report. Magistrate Judge Alba previously found

linckrodt Inc., jointly filed the instant motion. The Court held an evidentiary hearing on August 23–24, 2001, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The parties submitted proposed findings of fact and conclusions of law on September 19, 2001. The Court has reviewed the testimony and exhibits presented at the evidentiary hearing, the opinions submitted by the expert witnesses, the relevant scientific literature, the proposed findings of fact and conclusions of law, the briefs supporting and opposing the motions, and the pertinent case law. The Court now issues the following memorandum opinion and order.

## BACKGROUND

The Court has previously set forth the background of the parties and the nature of the claims in a memorandum opinion and order dated August 24, 2001. Those facts and issues will not be repeated in detail here. In this action, plaintiffs contend the release of the toxin, Royal Demolition Explosive ("RDX"), and its breakdown properties, from defendants' explosives manufacturing plant in Spanish Fork Canyon, Utah, caused plaintiffs' non-hodgkins lymphoma cancers. Plaintiffs allege the chemicals left the defendants' plant via a water pathway that carried the chemicals into soil and wells on plaintiffs' properties in nearby Mapelton, Utah. Plaintiffs claim they contracted cancer by eating produce grown in this contaminated soil and from eating fish grown in ponds on their properties. The present motion addressed in this opinion deals with plaintiffs' proffered experts who offer opinions as to the doses of the cancer—producing chemicals plaintiffs received.

On August 24, 2001, this Court entered an order preventing plaintiffs' medical causation expert, Dr. Dennis Weisenburger, from testifying that RDX, by itself, more likely than not caused plaintiffs' non-hodgkin's lymphoma ("NHL"). However, the Court found admissible Dr. Weisenburger's opinion that certain breakdown chemicals derived from the parent compound RDX more likely than not caused plaintiffs' NHLs. These breakdown chemicals consist of MNRDX, DNRDX, TNRDX and hydrazines.[2] In concluding that RDX breakdown chemicals more likely than not caused plaintiffs' NHL, Dr. Weisenburger relied upon Dr. McLendon's expert report for dose and exposure estimates for each plaintiff. Plaintiffs retained Dr. McLendon to analyze the chemical fate and plant uptake of RDX and its breakdown products on plaintiffs' properties, and to prepare a report estimating each plaintiffs' ingestion of RDX and its breakdown products for purposes of calculating dose amounts for each plaintiff infected. *See* attached Ex. A, "SMI's Expert and Rebuttal Reports." Dr. McLendon's expert dose estimations are based on two principal scientific theories.[3]

---

that Mr. Woodland was not one of plaintiffs' designated experts. Accordingly, the Court will construe defendants' motion in limine as applying only to Dr. McLendon.

**2.** Formaldehyde was also detected as a second order breakdown product. However, Dr. McLendon's's dose estimate for formaldehyde is irrelevant because plaintiffs' medical causation expert, Dr. Weisenburger, did not rely on plaintiffs' probable exposures for formaldehyde to formulate or support his opinions on medical causation. This is also true for the liquid nitrate esters, EGDN, DEGDN, TMETN and BTTN.

**3.** Dr. McLendon's's dose estimations are also conditioned upon plaintiffs demonstrating, through their transport expert, Dr. Fred Marimelli, that defendants' chemicals were transported from the explosives plant onto plaintiffs' properties prior to their diagnoses. Defendants have filed a *Daubert* motion seek-

The first dose estimate theory is based on the proposition that the explosives compound RDX degrades[4] or breaks down in the Mapelton environment according to the chemical pathway predicted by Dr. N.G. McCormick. *See* McCormick, N.G., *et al., Biodegradeation of hexahydro–1,3,5,–trinitro–1,3,5–triazine,* App. Environ. Microbiol. 42:817–823 (1981) ("McCormick pathway"). The McCormick pathway theorizes that, under certain environmental conditions, RDX degrades into predictable compounds, which Dr. McCormick refers to as first and second order degradation products. *See* attached Ex. B, "The McCormick Pathway." The first order breakdown products consist of MNRDX, DNRDX and TNRDX. The second order breakdown products, degrading from MNRDX, DNRDX and TNRDX, are hydrazines, formaldehyde and other nitrosamines.

Plaintiff Howard Ruff's well has been analyzed for the RDX breakdown products on two sampling dates, June 1998 and August 1999.[5] Detections for the first order breakdown products were positive on both dates, while concentrations for the second order breakdown products were below laboratory detection limits, but were assumed to be present in certain concentrations based on the predicted McCormick pathway. The actual and predicted concentrations of these contaminants were used by Dr. McLendon to determine plaintiffs' level of exposure through the consumption of drinking water, fish, and homegrown fruits and vegetables irrigated with contaminated water. Defendants do not contest plaintiffs' exposure or dose estimates for fish or drinking water, but contest the dose estimates calculated from the ingestion of fruits and vegetables. Dr. McLendon determined that the ingestion of fruits and vegetables was a primary exposure pathway for each plaintiff. *See* attached Ex. C, "Individual Exposure Fact Sheets."

Dr. McLendon's second theory supporting plaintiffs' dose estimations proposes that RDX and its related breakdown products were taken up and concentrated in the tissues of fruits and vegetables that were watered with contaminated water and subsequently consumed by plaintiffs. The propensity for a given plant to draw in a chemical, like RDX, from soil and/or groundwater is described in terms of a constant, known as a bioconcentration factor or BCF. Dr. McLendon estimated that RDX has a BCF of 9.7 in this case. Once a BCF is calculated for a given plant, the concentration of RDX in the plant can be predicted using the following formula:

predicted concentration in fruits and vegetables = concentration in groundwater × BCF.

A BCF value greater than 1 indicates that the chemical of concern was concentrated in the plant tissue over a certain time period. A BCF value less than 1 indicates

---

ing to exclude the testimony of Dr. Marinelli. That motion is under advisement.

4. Degradation is the process by which chemical concentrations decrease by chemical or biological means due to transformation into another compound. The terms "breakdown," "degradation" and "biodegradation" have been used interchangeably by Dr. McLendon and other experts in this case.

5. Because the Petersen well has not been tested for these degradation products, and since the average RDX concentrations are essentially equivalent in the Ruff and Petersen wells, the concentrations for the RDX breakdown products in the Ruff well were also used as the exposure concentrations for the RDX degradation products for Marilyn Petersen. The Ruff well was also used to estimate chemical concentrations for the Bates. The Bates' well has not been tested for RDX or its breakdown properties. However, the Bates' well is drilled in a similar way and at the same depth as the Peterson well. It also "taps" the same aquifer as the Peterson well.

that there is some form of resistance to the transport of the material into the tissue or that some of the chemical has been eliminated from the tissue. In other words, if RDX has a BCF of 10, and a tomato plant is irrigated with water contaminated with 1 part per billion ("ppb") of RDX, the concentration of RDX in the tomato fruit would be 10ppb, or ten times the concentration in the irrigation water. Thus, the value of the BCF for RDX and its degradation products is a significant measure of dose in this case because it directly affects the predicted concentration for a primary exposure route—the fruits and vegetables consumed by plaintiffs.

Defendants challenge both of the above dose estimate theories used by Dr. McLendon in calculating plaintiffs' dose estimates, which were ultimately relied upon by Dr. Weisenburger.[6] Defendants do not contend, in this motion, that Dr. McLendon's dose estimates are not sufficient to cause plaintiffs' alleged injuries. Rather, defendants contend that Dr. McLendon, the principal author of the SMI report, is not qualified to express an opinion on plaintiffs' level of dose and that his testimony does not meet the standard for admissibility of scientific testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons stated below, the Court finds that Dr. McLendon is qualified to render a dose estimation opinion in this case and that the dose theories relied upon by Dr. McLendon satisfy the requirements set forth under Rule 702 and *Daubert*.

## DISCUSSION

### A. Qualifications

Defendants argue that Dr. McLendon lacks experience and qualifications to render a reliable dose opinion in this case. Prior to the August 23–24, 2001, *Daubert* hearing, Dr. McLendon's credentials were left unchallenged. Nevertheless, the expert qualifications of Dr. McLendon cited by plaintiffs are as follows. Dr. McLendon, Ph.D., is Vice President of Ecological Systems at SMI. He has 28 years experience in the areas of plant-soil ecology, ecological risk assessment, ecology of disturbed lands, chemical vegetation sampling and monitoring, biostatistics, and ecological modeling. Dr. McLendon has served on the faculties of Colorado State University, University of Texas at El Paso, and Texas A & M University. He has authored or co-authored over 50 scientific publications and has conducted ecological research involving over $5 million funded by various governmental and private environmental organizations. Dr. McLendon has conducted courses in ecological risk assessment and chemical vegetation sampling sponsored by the EPA and national Park Service, as well as Colorado State University. He testified at the *Daubert* hearing that he has analyzed the chemical fate or degradation pathways for various chemicals, including the explosive compound ammonium nitrate and other explosives chemicals. Dr. McLendon also testified that he has many years of experience in the study of plant uptake of chemical compounds.

It is important to note that Dr. McLendon works with a team of chemists and other experts at SMI, and validly relies

**6.** It should be noted that defendants are not challenging Dr. McLendon's dose estimates for liquid nitrate esters-EGDN, DEGDN, TMETN, and BTTN, which were released from defendants' faulty pond liner in 1986. Thus, even if the Court grants the instant motion in limine, summary judgment is not proper because this motion does not affect the exposure data for nitrates, and this Court found that Dr. Weisenburger could offer causation testimony linking nitrates to NHL.

upon those experts for information relating to historical and well-documented dose estimates. In the instant case, Dr. McLendon worked with and relied upon the expertise of Dr. Meyer, co-author of SMI's degradation and dose estimate report, for the RDX degradation pathway.[7]

■ The Court finds that Dr. McLendon has sufficient knowledge, training and experience to qualify as an expert in the field of dose estimation. Defendants, however, argue that Dr. McLendon does not have sufficient expertise with the explosives compound RDX to render a reliable dose estimation opinion in this case. The Court rejects this argument as an overly constrictive view of the requirements of Rule 702. *See Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 809 (3rd Cir. 1997) ("We reject [defendant's] suggestion that [the doctor] must be an expert in Dursban to provide expert testimony on the causation of [plaintiff's] injury"). Dr. McLendon testified that he has analyzed the degradation pathway and plant uptake for numerous other chemicals, including explosives chemicals, for purposes of conducting human dose and exposure estimates. The fact that he has not analyzed, prior to this litigation, RDX and its breakdown products does not disqualify him from testifying as a dose estimation expert in this case.

**B. Daubert**

■ The gatekeeper inquiry under Rule 702 is ultimately a flexible determination, keeping in mind that rejection of expert testimony has been the exception rather than the rule. *See Goebel v. Denver and Rio Grande Western Railroad*

*Company*, 215 F.3d 1083, 1089 (10th Cir. 2000); *see also* Fed.R.Evid. 702, advisory committee notes (Dec. 1, 2000). "Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible testimony." *Daubert* 509 U.S. at 595, 113 S.Ct. 2786. Federal Rule of Evidence 702 was recently amended in response to *Daubert* and its progeny. Amended Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702 (as modified Dec. 1, 2000). "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Goebel* at 1087–89 (quoting *Daubert* 509 U.S. at 592, 113 S.Ct. 2786). This "gatekeeper" function requires the Court to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts. *See Daubert* 509 U.S. at 592, 113 S.Ct. 2786. In making these determinations about the

---

7. Dr. Meyer, whose credentials are unchallenged, is experienced in chemical degradation and fate. He has a Ph.D. in fishery and wildlife biology, an M.S. in biochemistry and biophysics, and a B.S. in chemistry. Dr. Meyer is experienced in human dose modeling and has developed and successfully utilized food-chain models for completion of human dose estimates and risk assessments. In addition, Dr. Meyer is the author of peer-reviewed, published articles on soil contamination and risk assessment.

reliability of the theory which is the subject of the expert testimony, the Court may consider whether (1) it can be and has been tested, (2) the theory or technique has been subjected to peer review and publication, (3) there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation, and (4) the theory has been generally accepted in the relevant scientific community. *See id.* at 593–94, 113 S.Ct. 2786.

However, the Tenth Circuit "recognizes that the district court need not 'recite the *Daubert* standard as though it were some magical incantation, or apply all of the reliability factors suggested in *Daubert* or *Kumho.*'" *Goebel* at 1089 (quoting *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir.1998)). "What is necessary is that the expert arrived at his ... opinion by relying upon methods that other experts in his field would reasonably rely upon in forming their own, possibly different opinions." *Head v. Lithonia*, 881 F.2d 941 (10th Cir. 1989).

In the context of dose estimation, "a plaintiff must prove [the] level of the exposure using techniques subject to objective, independent validation in the scientific community. At a minimum, the expert testimony should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination." *Mitchell*, 165 F.3d at 781. The dose expert need not be "undisputably correct" in its estimation. *See id.*

## C. Daubert Application

Defendants advance two primary arguments attacking Dr. McLendon's dose estimation methods. First, defendants contend that the RDX degradation pathway relied upon by plaintiffs, the McCormick pathway, is unreliable and not generally accepted in the scientific community and therefore fails to meet the standards set

forth in *Daubert.* Second, defendants argue that Dr. McLendon's methodology in estimating a BCF for RDX is not sufficiently tied to the facts of this case as required by Rule 702.

### *1. The McCormick Pathway*

■ The Tenth Circuit has acknowledged, pursuant to *Daubert,* that "the plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community" to satisfy Rule 702 reliability requirements. *Mitchell v. Gencorp,* 165 F.3d 778, 781 (10th Cir.1999) (citing *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir.1998)). Thus, the Court can find that an expert's theory is reliable, absent a finding that the theory is generally accepted in the scientific community. On the other hand, evidence that a theory has attained general acceptance in the scientific community "can be an important factor in ruling particular evidence admissible." *Mitchell,* 165 F.3d at 780; *see also Daubert* 509 U.S. at 594, 113 S.Ct. 2786.

■ In the instant case, the Court finds that the McCormick RDX pathway is generally accepted in the scientific community, and regardless of its apparent broad general acceptance, is sufficiently reliable to satisfy the requirements of Rule 702. The strongest piece of evidence that the RDX degradation pathway predicted by McCormick is generally accepted in the relevant scientific community is defendants' own admission that "McCormick's theory represents the most widely cited model concerning the degradation of RDX," in the scientific community. Def. motion at 17. In addition, prior to this litigation, defendants' degradation expert, Dr. David Kaplan, repeatedly cited to the McCormick pathway for the proposition that RDX degrades into predictable products in anaerobic (without oxygen) environments. For

example, in 1992, Dr. Kaplan published a review article summarizing the biotransformation pathway for various "hazardous energetic organo-nitro [explosive] compounds ... found as contaminants in many environments." Kaplan, L. David, *Biological Degradation of Explosives and Chemical Agents*, U.S. Army Natick Research, Development and Engineering Center, Biodegradation Vol. 3: 369–385 (1992) (hereinafter "Kaplan 1992"). The explosive compound RDX was among those chemicals reported by Dr. Kaplan to biotransform or degrade along the McCormick pathway. Dr. Kaplan stated, citing Dr. McCormick:

> RDX and the related N-acetylated derivative, AcRDX, were studied in aqueous systems and found to be mineralized by mixed populations of microorganisms under anaerobic conditions when supplemental carbon was provided (Fig.6) (McCormick et al.1981, 1985a, 1985b). Intermediates in this pathway included mono-, di-, and tri-nitroso-compounds (MNRDX, DNRDX, and TNRDX) formed during the sequential reduction of the nitro groups on the parent compound [RDX]. Traces of hydrazine, 1,1–dimethylhydrazine, and 1,2–dimethylhydrazine were also detected in the samples . . . .

Kaplan 1992 at 251. *See also*, Kaplan, L. David, *Biotechnology and Bioremediation for Organic Energetic Compounds*, U.S. Army Natick Research, Development and Engineering Center, Biodegradation Vol. 3: 369–385 (1996) (reporting the same). It is undisputed that Dr. Kaplan has another review article pending publication which also reports that RDX degrades down the McCormick pathway.

Given that defendants' own expert stated that "Dr. McCormick's theory represents the most widely cited model concerning the degradation of RDX," and repeatedly and unqualifiedly cites the McCormick pathway in recent pre-litigation scientific publications, the Court finds that sufficient evidence exists to indicate that the McCormick pathway is generally accepted in the scientific community.

Nevertheless, defendants maintain that, even if the Court finds the McCormick pathway is generally accepted in the scientific community, Dr. McLendon's method is flawed because he failed to consider a new wave of scientific literature that revises the McCormick pathway. "Since its [McCormick] publication in 1981 a number of research teams have studied, clarified and revised McCormick's RDX degradation model." Def. Motion at 17. The Court need look no further than defendants' expert's testimony at the *Daubert* hearing on August 24, 2001, to determine whether this is an accurate statement, publication in 1981 a number of research teams have studied, clarified and revised McCormick's RDX degradation model.

Q. Ms. Fields (attorney for plaintiff): Let me read you a statement: Since its Do you agree that even one research team has revised Mcormick's RDX degradation model?

A. Dr. Kaplan: I would have to go back and look at all of the papers. I do not recall that being the case.

Q. Ms. Fields: As an expert on RDX degradation as you sit here today you can't think of a single research team that has revised McCormick's RDX degradation model?

A. Dr. Kaplan: That is correct.

Q. Ms. Fields: That statement for the record is from page 17 of the motion in this case for this hearing.

August 24, 2001, Transcript at 126.

Indeed, defendants have cited to only one author, Dr. Jalal Hawari, in the twenty years since the publication of the McCormick study that has predicted another degradation pathway. *See* Hawari, J., *et al.*,

*Characterizations of Metabolites During Biodegradation of Hexahydro–1,3,5–Trinitro–1,3,5–Triazine, with Municipal Sludge,* Applied Environmental Microbiology, Vol. 66, p. 2652 (June 2000). Dr. Hawari's study reported that the biodegradation of RDX in liquid cultures with anaerobic sludge involved at least one other pathway, in addition to the McCormick pathway. *See id.* Dr. Kaplan conceded during cross examination that Dr. Hawari's degradation theory is not generally accepted in the scientific community and admits that the "McCormick pathway" and the "Hawari pathway" may exist at the same time. The Court finds that the issue whether one pathway should be given more weight than the other goes to the weight and not the admissibility of the evidence. *See Kannankeril v. Terminix Int'l,* 128 F.3d 802, 806 (3rd Cir.1997) (finding that the issue whether an ambient air test should be given more weight than a review of pesticide application records goes to the weight rather than the admissibility of the evidence). Accordingly, the Court cannot conclude that Dr. McLendon's failure to consider the Hawari pathway, which is not generally accepted in the scientific community, and reliance instead upon the widely accepted McCormick pathway, makes his opinion on dose unreliable. "Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Mitchell,* 165 F.3d at 780.

Two other factors that a district court can take into account in assessing reliability are peer review and testing. "A trial court may consider whether the theory has been subjected to peer review. Although not dispositive, subjecting a theory to the scrutiny of the scientific community may help validate an otherwise infirm theory by decreasing the likelihood that substantive flaws in the methodology exist." *Id.* In the instant case, it is undisputed that the McCormick pathway was selected for publication in 1981 and that, more importantly, it was peer-reviewed. In addition, the McCormick pathway has been cited over 41 times in the Science Citation Index which catalogs the frequency of publications cited in peer reviewed literature. *See* Transcript, August 24, at 112–113.

The McCormick pathway has also been tested in the scientific community. "In determining the reliability of a particular scientific theory or technique," courts should also consider "whether it can be and has been tested." *Louderback v. Orkin Exterminating Co., Inc.,* 26 F.Supp.2d 1298, 1303 (D. Kan.1998). Dr. Kaplan acknowledges that the McCormick pathway has been tested and confirmed in at least three different test sites, including Mapelton. During the second day of the *Daubert* hearing in the instant matter, Dr. Kaplan conceded on cross-examination that he knew of at least three test sites where scientists published studies confirming the existence of RDX and its breakdown products as predicted in the McCormick study.

Q. So we have three sites, Mapelton with Dr. Spanggord, Cornhusker with Dr. Cassada, and the Cape Cod site with the Army, all of which reported the detections of those compounds in an open system.

A. Fair enough. I don't disagree with that.

*See* August 24, 2001, Transcript at 151. The above facts demonstrate that the McCormick theory has been published, peer-reviewed, tested and that it is generally accepted in the scientific community. Accordingly, the Court finds that the McCormick theory satisfies the reliability requirements of Rule 702.

■ Defendants next argue that even if the Court finds that the McCormick path-

way itself is accepted as reliable, the conditions in Mapelton are not similar to those anaerobic conditions present in the McCormick study, and thus the study is irrelevant and does not fit the facts of this case under 702. The relevancy requirement under 702 is determined by ascertaining whether the reasoning or methodology can be properly applied to the facts in issue. *See Daubert* 509 U.S. at 593, 113 S.Ct. 2786. In other words, the Court must determine whether the testimony is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *See Summers v. Mo. Pac. Railroad System*, 132 F.3d 599, 603 n. 5 (10th Cir.1997).

■ The McCormick study was conducted by combining RDX with various nutrients, including beef extract, molasses and sludge, all under anaerobic conditions. At the *Daubert* hearing, plaintiffs' expert, Dr. McLendon, explained the relevancy of the McCormick conditions to a real world open environment like Mapelton:

> The molasses was added for a carbon source for microbes. The beef broth adds proteins. Sludge adds the microbial population. These substances represent substances that occur naturally in the soil that would be there for degradation. So what McCormick had in his vials is a microcosm, a small example under controlled conditions of the same sorts of processes that would be found in the soil in Mapleton. The carbon source provides carbon for microbes. As microbes grow they begin to degrade the RDX, the larger the microbial population the faster the degradation. Rain or irrigation fills air pockets in soil and

moves the oxygen out, soil also clumps or aggregates or binds together without oxygen. Deep soil is without oxygen as well.

*See* Transcript, August 23, at 151. The Court finds Dr. McLendon's explanation reasonable and supported by actual test data from both the Mapelton environment and the Ruff well.[8]

First, defendants' own expert consultants recognized as early as 1997, prior to the commencement of this litigation, that RDX degrades in the Mapelton environment and that many of the resulting metabolites are highly toxic. *See* plaintiffs' Ex. 16 at 0W303496. In 1998, also before these lawsuits were filed, defendants retained Dr. Ronald Spanggord, a highly regarded analytical chemist from the Stanford Research Institute, to test water from the Ruff well for MNRDX, DNRDX and TNRDX. It is undisputed that Dr. Spanggord detected all three first order chemicals predicted in the McCormick pathway. In 1999, defendants again hired Dr. Spanggord to test for the same three degradation products. Once again, Dr. Spanggord found all three compounds. This evidence clearly suggests that RDX is degrading in the Mapelton environment consistent in a manner with the first order degradation products predicted in the McCormick pathway. Detection of the first order degradation products, according to defendants' degradation expert, Dr. Kaplan, signifies that the second order degradation products, though below laboratory detection limits, are present. *See* August 24, 2001, Transcript at 162.

Second, in further support that RDX degrades into the alleged breakdown prod-

---

8. Some confusion exists whether the defendants' RDX data was from the Evans/Ruff well or the Young/Stephens well. Defendants have stated in documents submitted to the State of Utah that the wells are the same. *See* Plaintiffs' Ex. 11 at 10 (August 24, 2001 hear-

ing). In addition, Dr. McLendon's statistical analysis of data from the Ruff and Petersen wells demonstrates that they have statistically comparable levels of contamination. *See* RR at Table 11a.

ucts in the Mapelton environment, plaintiffs cite a recent peer reviewed article which reported close to identical detections of MNRDX, DNRDX and TNRDX from groundwater containing concentrations of RDX in the same range as in the Mapelton groundwater. *See* Cassada, D.A., *Sensitive Determination of RDX, Nitroso–RDX Metabolites, and Other Munitions in Ground Water by Solid–Phase Extraction and Isotope Dilution Liquid Chromotography–Atmospheric Pressure Chemical Ionization Mass Soectrometry,* 844 Journal of Chromatography 87–95 (March 1999) ("Cassada paper"). The test samples in the Cassada paper came from wells at the cornhusker munitions site in Nebraska. That site, like Mapelton, is an open real world system—not a laboratory experiment. *See id.; see also* Thorne, P.G., *Fate of Explosives in Plant Tissues Contaminated During Phytoremidiation,* U.S. Army Cold Regions Research and Engineering Laboratory (1999) (demonstrating McCormick pathway for RDX degradation through laboratory testing).

The Court finds that plaintiffs have met their burden in demonstrating the relevancy of the McCormick pathway to plaintiffs' situation in Mapelton. Strong evidence exists that RDX is degrading along the McCormick pathway on plaintiffs' properties and plaintiffs have produced scientific literature to support such a pattern. Accordingly, the McCormick pathway meets the "fit" or relevancy requirements of Rule 702, and Dr. McLendon validly applied the McCormick theory to the facts of this case.

Finally, defendants argue that Dr. McLendon's method in applying stoichiometric equations to the McCormick pathway to estimate plaintiffs' dose is fundamentally flawed. This issue turns on whether the McCormick pathway itself is reliable. The Court has previously found that the McCormick pathway satisfies the requirements of Rule 702. Therefore, the Court cannot find that Dr. McLendon's use of stoichiometry in this case constituted a methodological flaw.

Accordingly, the Court finds that Dr. McLendon's method in utilizing and relying upon the McCormick pathway to estimate the level of RDX and its breakdown products present in plaintiffs' wells is sound scientific methodology and sufficiently tied to the facts of this case.

### 2. *Bioconcentration Factor ("BCF")*

■ Defendants next argue that Dr. McLendon's methodology for estimating the appropriate BCF for RDX in this case, though scientifically sound, does not fit the facts of plaintiffs' case. Specifically, defendants contend that Dr. McLendon failed to select the most relevant or applicable scientific studies to formulate a bioconcentration factor or BCF for RDX in this case.[9] The Court finds that the issue whether plaintiffs' expert could have relied upon more relevant scientific literature in estimating a BCF for RDX goes to the weight, not the admissibility of evidence. *See United States v. Velasquez,* 64 F.3d 844, 848 (3d. Cir.1995).

In arriving at an estimated BCF for RDX in this case, both defendants' dose expert, Dr. McKone, and plaintiffs' dose expert, Dr. McLendon, analyzed and reviewed the same twelve scientific BCF studies concerning RDX uptake in fruits and vegetables.[10] It is undisputed that all

---

**9.** Q. Ms. Fields: You dispute whether hydroponic studies should be used in calculating BCFs.

 A. Dr. McKone: I say it should be given less weight.

*See* Transcript at 50.

**10.** *See e.g.,* Balbach, H.E., Letter to R. Muhly, dated July 31, 1990; Banwart, E.L. and D. Chen, *Plant uptake of RDX from spiked soils,* Agronomy Abstracts 34:35 (1991); Best, E.P.H., M.E. Zappi, H.L. Frederickson, S.L. Sprecher, S.L. Larson, and M. Ochman,

twelve studies were published and neither plaintiffs' nor defendants' experts allege any of the papers to be scientifically invalid. In addition, Dr. McKone testified that scientists in this discipline frequently examine these studies to estimate the appropriate BCF for RDX and other compounds in a given case. These studies, in general, reported that RDX was taken up by a variety of fruits and vegetables and that RDX was subsequently translocated or moved, to the plant leaves. *See* attached Ex. D, "Summary of Twelve BCF studies." Of the twelve papers evaluated by the parties' experts, the propensity for plants to uptake RDX was studied in three basic experimental types:

(1) **Hydroponic studies**: hydroponic studies involve the cultivation of plants in contaminated water or another solution absent soil.

(2) **Soil studies**: soil studies consist of plants grown in artificially contaminated soils, but irrigated with uncontaminated water.

(3) **Irrigation studies**: irrigation studies involve plants grown in uncontaminated or clean soil and irrigated with contaminated water.

Although Dr.'s McKone and McLendon analyzed the same twelve studies, they ultimately selected different studies within the twelve to estimate a BCF for RDX in this case. Defendants' dose expert, Dr. McKone, contends that the Checkai and Simini study, an irrigation study, is most applicable to plaintiffs' garden situations. *See* Checkai, R.T. and M. Simini, *Phytophysical response of crops to irrigation waters containing low concentrations of RDX and TNT: Ecotoxicological implications,* (1996) ("Checkai and Simini study"). As previously noted, irrigation studies involve the use of clean soil to grow plants irrigated with RDX contaminated water. Relying upon the Checkai and Simini study, Dr. McKone estimated the BCF for RDX at 1.

Dr. McLendon testified that he carefully selected data from three hydroponic studies as being the most relevant and repre-

*Screening of aquatic and wetland plant species for phytoremediation of explosives contaminated groundwater from the Iowa Army Amjunition Plant,* Annuals N.Y. Academy of Science 829: 179–194 (1997); Cataldo, D.A., S.D. Harvey, and R.J. Fellows, *An evaluation of the environmental fate and behavior of munitions material (TNT, RDX) in soil and plant systems: environmental fate and behavior of RDX.* (1990); Checkai, R.T. and M. Simini, *Phytophysical response of crops to irrigation waters containing low concentrations of RDX and TNT: Ecotoxicological implications,* (1996); R.J. Fellows, S.D. Harvey, D.A. Cataldo, *Evaluation of the metabolic fate of munitions material (TNT, RDX) in plant systems and initial assessment of material interaction with plant genetic material: validation of the metabolic fate of munitions material in mature crops,* (1995); S.D. Harvey, R.J. Fellows, D.A. Cataldo and R.M. Bean, *Fate of the explosive hexahydro–1,3,5–trinitro–1,3,5–triazine (RDX) in soil and bioaccumulation in bush bean hydroponic plants.* Environ. Toxicol. Chem. 10:845–855 (1995); Larson, S.L., R.P. Jones, L. Escalon, and D. Parker.1999, *Classification of explosives transformation products in plant tissue.* Environ. Toxicol. Chem. 18:1270–1276 (1997); Price, R.A., J.C. Pennington, S.L. Larson, D. Neumann, and C.A. Hayes, *Plant uptake of explosives from contaminated soil and irrigation water at the former Nebraska Ordinance Plant, Mead, Nebraska,* U.S. Army Corps of Engineers, Waterways Experimental Station Technical Report EL–97–11 (1997); Simini, M., R. Rowland, E.H. Lee, and R.S. Wentzel, *Detection of stress in Cucumis sativus exposed to RDX using chlorophyll fluorescence,* SETAC 13th annual meeting, Cincinnati, Ohio (1992); Thomson, P.L., L.A. Ramer, and J.L. Schnoor, *Hexahydro–1,3,5–trinitro–1,3,5–triazine translocation in poplar trees.* Environ. Toxicol. Chem. 18:279–284 (1999); Thorne, P.G., *Fate of explosives in plant tissues contaminated during phytoremediation,* U.S. Army Cold Regions Research and Engineering Laboratory (1999).

sentative of plaintiffs' garden situations. *See e.g.,* Cataldo, D.A., S.D. Harvey, and R.J. Fellows, *An evaluation of the environmental fate and behavior of munitions material (TNT, RDX) in soil and plant systems: environmental fate and behavior of RDX* (1990). As noted, hydroponics involves the cultivation of plants without soil in an RDX contaminated water solution. The average BCF value for these studies was 9.7. Plaintiffs argue that Dr. McLendon selected hydroponic studies over the Checkai and Simini irrigation studies for two reasons. First, the Checkai and Simini study involved plants grown in clean soils, unlike the contaminated soils in plaintiffs' gardens.

> Q. Ms. Fields: The Checkai and Simini studies that you consider most relevant, that is a study, an irrigation study as I understand the proffer, dealing with clean soil? They start with clean soil, right?
>
> A. Dr. McKone: Yes.
>
> Q. Ms. Fields: Pure non-RDX containing soil?
>
> A. Dr. McKone: Yes.
>
> Q. Ms. Fields: [So], they started with clean soil and you deem that most applicable to Mapelton even though these people in Mapelton did not start with clean soil? Yes?
>
> A. Dr. McKone: Yes, but with qualifications.

See August 24, 2001, Transcript at 36. Dr. McLendon testified that in a clean soil irrigation study, in which contaminated water is applied to uncontaminated soil, the soil has to absorb the maximum amount of RDX that it can absorb before the study plant can take up any real amount of RDX. This causes the BCF value to be under-reported in clean soil studies.

> Plants do not take contaminants up, they don't take RDX up from the soil particles, they take it up from the solution. So as the RDX is applied there is an attraction and absorption by the soil particles and the RDX is taken out of the water and bound to the soil and organic matter and, therefore, the actual amount available to the plant decreases .... If the equilibrium [maximum absorption] has not been achieved the BCF value is lower.

August 23, 2001, Transcript at 159. In contrast, irrigation studies involving contaminated soil where equilibrium has been achieved, tend to produce higher BCF values in plants because less RDX is lost through soil absorption. This is also true for hydroponic studies. As explained by Dr. McLendon at the *Daubert* hearing:

> The hydroponic study is in a controlled environment and it looks at directly the concentration in the water that the plant is taking up, so you have a direct relationship between water concentration and tissue concentration, BCFs. In a garden setting the plants, again, they are not taking up the RDX from soil particles directly. They are taking it up from soil water.

*Id.* at 161. Thus, RDX uptake in plants grown in hydroponic settings is not impacted by clean soils competing for available RDX. Because the environment in Mapelton involved fruits and vegetables cultivated in contaminated soils, hydroponic settings are relevant because, like contaminated soil settings, RDX is not lost or diminished in the clean soil bonding process.

To further support Dr. McLendon's decision not to use the Checkai and Simini study, plaintiffs note that Checkai and Simini used a less polar extractant to grow the study fruits and vegetables, thereby minimizing RDX uptake.

> Q. Ms. Fields: So you would agree with me that in the Checkai and Simini study that you deemed most

relevant to this site they used the least polar extraction solvent to pick up RDX?

A. Dr. McKone: I would say they used a less polar solvent.

Q. Ms. Fields: You would agree with me ... that the less polar extraction solvent you use the less RDX you are going to take up?

A. Dr. McKone: Only in the context of this experiment. That is one paper, one isolated——

Q. Ms. Fields: One paper by Steve Larson who you recognize as experienced and published in this field?

A. Dr. McKone: Yes.

August 24, 2001, Transcript at 42. The Court finds Dr. McLendon's reasons for selecting hydroponic studies as opposed to irrigation studies to be based on reasonable analytical factors. The fact that plaintiffs' expert found the hydroponic studies to be more relevant than the Checkai and Simini study does not render his opinion irrelevant or inadmissible. Rather, that question goes to the weight, not the admissibility of evidence. Dr. McLendon analyzed and reviewed the available scientific literature regarding the uptake of RDX in plants. He provided a detailed analysis of the results reported in

the literature in their rebuttal report, taking into account all of the variable factors cited by defendants.

Our review of the literature is included in Attachment II. We have taken in account all of the data reported from 12 studies. In those studies, 175 BCF values for RDX in plants were presented, or data was presented from which BCF values can be calculated. Of the 175 values, 150(86%) were greater than 1.0 and only 25(14%) were less than 1.0, on a fresh weight basis .... Reported BCF values for RDX in plants range from 0.01 (kenaf stems and roots, Thorne 1999) to 69.9 (lettuce leaves, Price et al.1997), on a fresh weight basis. The mean (average) of the 175 values is 8.9, which strongly supports our estimated BCF of 9.7 for RDX, since the highest BCF values tend to be for leaves and fruit tissue, or the more commonly consumed edible portions of plants. The literature remains supportive when it is analyzed to account for type of plant tissue, species of plant, concentration of RDX in the supply media, organic content matter of the soil, length of exposure, and transpiration. Finally, the literature is fully supportive if one looks at the specific vegetables in, for example, Mrs. Peterson's garden and matches them up with the BCFs from the most appropriate study or studies for each.[11]

11. Calculation of an average BCF value for vegetables grown in Marilyn Petersen's garden in 1981

| Vegetable | BCF (water based) | Amount (oz) | BCF × Amount |
|---|---|---|---|
| Beets | 3.7 | 90 | 333 |
| Broccoli | 16.1 | 80 | 1,288 |
| Bush Bean | 18.6 | 520 | 9,672 |
| Carrot | 7.4 | 90 | 666 |
| Corn | 2.4 | 100 | 240 |
| Cucumber | 10.0 | 80 | 800 |
| Lettuce | 16.7 | 8 | 134 |
| Onion | 3.7 | 132 | 488 |
| Peas | 33.4 | 80 | 2,672 |
| Pickles | 10.0 | 52 | 520 |
| Potato | 3.7 | 360 | 1,332 |
| Squash | 10.0 | 192 | 1,920 |
| Tomato | 10.0 | 632 | 6,320 |
| Total | | 2416 | 26,385 |

*See* plaintiffs' Ex. 3 at 13–14. Every expert to render a scientific opinion regarding the appropriate BCF for RDX in this case has reviewed the same valid scientific literature and selected, employing valid scientific discretion, studies deemed relevant to the instant case.

Indeed, Dr. Brian Murphy, defendants' dose litigation consultant, has rendered several opinions regarding the BCF for RDX employing the same methodology as that of Dr. McLendon and Dr. McKone.

Q. Ms. Fields: Murphy's methodology ... was to, number 1[sic], review the literature; is that right?

A. Dr. McKone: Yes.

Q. Ms. Fields: No. 2, select the literature that in his judgment was most relevant to the situation in Mapelton; is that correct?

A. Dr. McKone: Yes.

Q. Ms. Fields: And then No. 3, from that literature determine or estimate BCFs for RDX in various fruits and vegetables; is that correct?

A. Dr. McKone: Yes.

Ex. 10 at p. 87 (Dr. McKone Depo.). Employing this methodology, and relying upon literature different than that selected by Dr. McKone or Dr. McLendon, Dr. Murphy, in 1995, submitted to the State of Utah a report estimating a BCF for RDX of 50. This estimate is approximately five times that of plaintiffs' BCF of 9.7. In 1996, Dr. Murphy revised his RDX BCF from 50 down to 12.5, still greater than plaintiffs' estimate. After the commencement of this litigation, Dr. Murphy again lowered his RDX BCF from 12.5 to 1. *See* August 24, 2001, Transcript at 18–20. At the *Daubert* hearing, Dr. McKone conceded that he does not consider Dr. Murphy's BCF estimate of 50 to be "junk science." *See* August 24, 2001, Transcript at 57. It would be difficult for the Court to find Dr. McLendon's BCF of 9.7 inadmissible when defendants' own expert believes that a BCF of 50, based upon a selection of BCF literature for RDX, is not junk science in this case.

Rather, the Court finds that Dr. McLendon's decision to utilize hydroponic studies over irrigation studies was a valid scientific opinion, based upon an analysis of the available scientific literature. The literature relied upon by Dr. McLendon, and the other experts, relates to the exact issue involved in this case; the appropriate BCF for the explosives compound RDX. Accordingly, the Court finds Dr. McLendon's opinion, that the BCF for RDX in this case is 9.7, is sufficiently tied to the facts of this case and will aid the jury in resolving the factual controversy surrounding the appropriate BCF for RDX. *See Summers v. Mo. Pac. Railroad System*, 132 F.3d 599, 603 n. 5 (10th Cir.1997).

■ Defendants next contest Dr. McLendon's BCF estimate for the first order breakdown products. Dr. McLendon concluded that the BCF for MNRDX, DNRDX, and TNRDX should be estimated to be the same as RDX–9.7–because of the near identical chemical similarities. *See* SMI's Rebuttal Report at 14. For the first order degradation products of RDX, there are no empirical studies in the scien-

| Mean | 10.9 |
| --- | --- |

Dr. McLendon focused on the vegetables grown in plaintiffs' gardens and matched those vegetables up with the BCFs from the most relevant study or studies. Marilyn Petersen reported that she grew 13 different vegetables in her garden in 1981. Based on her estimates of production by species, Dr. McLendon calculated an average BCF for the garden produce by multiplying the selected BCF value by the respective production value for that species, adding all products, and then dividing by 2416 (the total 1981 production). This resulted in a mean BCF value of 10.9. This value is similar to Dr. McLendon's original estimate of 9.7.

tific literature in which BCFs were directly measured. Thus, Dr. McLendon could not derive BCFs for these compounds in the same way it derived a BCF of 9.7 for RDX. Dr. McLendon therefore assumed that the BCF for these first order degradation chemicals would be the same for RDX. Dr. McLendon supports this assumption with the fact that these chemicals are derived from RDX and are structurally similar:

> Logically, as sequential nitro groups on the RDX molecule are reduced to nitroso groups, the overall polarity of the molecule would be expected to decrease (i.e., the nitroso group is less polar than the nitro group). As polarity decreases, the octano water partitioning coefficient (Kow) value would increase. Briggs, et al. (1983) have shown that as Kow increases (up to a value of 4.5) the uptake (or BCF) of a chemical will increase. Therefore, our assumption of the RDX value for the mono-, di- and tri-nitroso (MNRDX, DNRDX, and TNRDX) derivatives is likely conservative. Furthermore, in the absence of other information, the assumption of the same BCF is logical and reasonable, and is supported by additional practitioners in the field.

The Court finds this to be a reliable scientific assumption. In finding Dr. McLendon's BCF estimate for MNRDX, DNRDX, and TNRDX reliable, the Court "need not determine that the expert testimony ... is irrefutable or certainly correct. As with all other admissible evidence, expert testimony is subject to being tested by 'vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 261 (4th Cir.1999) (quoting *Daubert* 509 U.S. at 596, 113 S.Ct. 2786). Defendants' experts have failed to direct the Court to any contrary evidence demonstrating that the first order breakdown

products for RDX are not taken up by plants in the same manner as the parent compound RDX. The Court finds that Dr. McLendon's expert testimony regarding the estimated BCF for the RDX first order breakdown products satisfies the reliability requirements under 702.

 For the remaining degradation products, hydrazine, formaldehyde and other nitrosamines, Dr. McLendon employed the "Travis and Arms" equation to estimate BCFs. It is undisputed that this is the identical equation used by defendants' expert, Dr. Brian Murphy, in his submission to the State of Utah in 1995, which estimated exposure to the contamination via homegrown foods. The fact that the moving party's expert employed the same technique as plaintiffs' expert clearly supports admissibility. *See Ruiz–Troche v. Pepsi Cola,* 161 F.3d 77, 85 (1st Cir.1998). In addition, Dr. McKone conceded in his deposition that the Travis and Arms equation is commonly used in the scientific community to estimate dose.

Q. Is the Travis and Arms equation ... commonly used within the scientific community to estimate BCFs for organic chemicals in plants?

A. It is commonly used. It's frequently improperly used.

Q. Within the scientific community?

A. Not within the scientific community.

*See* Dr. McKone Depo, at 125–126. It is also undisputed that the EPA utilizes the Travis and Arms equation to calculate doses in human risk assessments. As noted by defendants' causation expert, Dr. Phillip Guzelian: "The formulas and equations used by SMI for derivation of concentrations in fish and vegetables, and dose from water, fish and vegetable intake appear to be in accordance with those recommended by the USEPA." *See* plaintiffs' omnibus report at 5–19.

Nevertheless, defendants contend that the use of the Briggs' equation would be more appropriate in estimating BCFs for the remaining degradation products. Plaintiffs actually used the Briggs' equation for RDX breakdown products and received similar results. Moreover, defendants failed to demonstrate why the Briggs' equation is superior to the Travis and Arms equation for purposes of calculating BCFs. The Court need not determine which of the competing scientific formulas has the best provenance. *See Ruiz–Troche,* 161 F.3d at 85 (finding that *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories is correct). It is sufficient to conclude that plaintiffs' expert employed a scientifically valid equation in estimating BCFs for the remaining degradation products.

Finally, there is an issue as to why plaintiffs failed to directly test the vegetables or soils from their own properties, rather than relying upon historical dose estimates using scientific literature. Plaintiffs contend that they could not find a laboratory that was both willing and capable of completing such testing. The United States Department of Defense evidently uses several labs that estimate dose for certain munitions sites. However, these laboratories are not allowed to complete testing for private litigation. There was a discussion in the *Daubert* hearing on August 23, 2001, regarding Midwest Research Institute ("MRI"), and their willingness to test the actual vegetables and groundwater on plaintiffs' property. However, plaintiffs contend that MRI was not capable of completing a reliable dose estimate. Further, plaintiffs contend that their own experts were confident in historical dose estimates, as opposed to testing the actual ground. Also, they did not have fruits and vegetables available to test before the time plaintiffs were diagnosed with NHL. Plaintiffs were also waiting for testing that defendants promised to conduct in connection with the Utah Department of Environmental Quality. Unfortunately, defendants were not able to complete those tests.

In any event, the focus of the reliability inquiry under 702 "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert* 509 U.S. at 595, 113 S.Ct. 2786. Defendants' expert, Dr. McKone, testified at the *Daubert* hearing that testing is not necessary or required for a dose estimation opinion to be scientifically reliable.

Q. Was it required in order to be valid scientific methodology for Ensign–Bickford to go out and test before Dr. Murphy submitted his dose estimates either in 1995 or in the year 2000 which is the report you have testified you reviewed of Dr. Murphy's.

A. No.

August 24, 2001, Transcript at 25. Therefore, the Court finds that plaintiffs' failure to test actual fruits and vegetables from their properties does not render Dr. McLendon's dose estimates invalid under *Daubert.*

### CONCLUSION

For the reasons stated above, the Court DENIES defendants' motion for summary judgment and motion to exclude the expert testimony of Dr. McLendon. Plaintiffs' motion to strike the testimony of Dr. Brian Murphy is also DENIED. IT IS SO ORDERED.

